UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA.

    Plaintiff,                                        Case No. 18–20242

v.                                                Honorable Thomas L. Ludington
                                                      Magistrate Judge Patricia T. Morris

WILLIAM E. PUTMAN, II

    Defendant.
_____/

## ORDER DENYING MOTION FOR RETURN OF PROPERTY WITHOUT PREJUDICE, TAKING MOTION FOR JOINDER AND MOTION IN LIMINE UNDER ADVISEMENT, AND DIRECTING RESPONSES

Defendant William Putman operates a firearms business in Caro, MI, which holds a Federal Firearms License (FFL). His son, Defendant Brandon Putman, is also affiliated with the business. Defendants live in a shared residence along with twenty–six family members.

According to the Affidavit of ATF Agent Stephen Ross (Agent Ross) in mid–November 2017, Brandon Putman went to Progressive Tool and Machinery in Elkton, MI and asked the shop owner if he could make 10 duplicates of a specific part, which the shop owner suspected to be a drop in–auto sear ("DIAS" or "auto–sear")[1]. Ex. 1 at pg. 18–31 (Ross Aff. ISO Warrant). The shop owner then contacted ATF. *Id.* Agent Ross met with the shop owner in December, 2017, and the shop owner gave Agent Ross the part in question. *Id.* The part was submitted to the ATF Firearms Technology branch for testing, which confirmed that the part was a DIAS. Ex. 2 at pg. 2 (Report of Technical Examination). The shop owner gave ATF Brandon Putman's contact information. An undercover ATF Agent, posing as a machinist at the shop, contacted

---

[1] A drop-in auto sear (DIAS) is a device which, when combined with other fire-control parts, can convert a semi-automatic AR-15 to fully automatic. Although a DIAS is in actuality a gun part and not a gun itself, a DIAS is legally considered a "machine gun" under 26 U.S.C. §5845(b).

Brandon Putman and had several discussions with him concerning the part he wanted duplicated and the price per duplicate of $100.[2] Ex. 2 at pg. 74–75, 105–115. (Investigation Reports – Undercover Contacts).

Based on this information, ATF obtained a search warrant for the Putman residence (the former residence). Ex. 1 at pg. 17, 32. The search warrant was executed on February 15, 2018 at 9:50am. Ex. 1 at pg. 56. Contemporaneously, another search warrant was executed at the Putman's new residence which was then under construction (the new residence). Ex. 1 at pg. 54. During the search of the former residence, ATF agents seized "one (1) Ruger, Model AR–556, multi–caliber rifle, serial number 850–7162" (the AR–15) which they found in William Putman's bedroom closet. Ex. 1 at pg. 56. Nothing was seized during the search of the new residence, although Brandon's phone was seized from his person during a search incident to arrest. Ex. 1 at pg. 55.

Based on the information provided during the September 7 hearing, it appears that the AR–15 was "functions checked" without ammunition on the day of the search (February 15) and the AR–15 tested as fully automatic without the addition of an auto–sear. The AR–15 was "functions checked"[3] again shortly thereafter at the ATF Flint office, with the addition of the DIAS Brandon is charged with possessing. ATF confirmed that the DIAS fit into/onto the AR–15, but it does not appear that the weapon was fired at that time. The record contains a Firearms Technology Criminal Branch Report of Technical Examination dated April 10, 2018. Ex. 1. at pg. 1–5. It appears this is the only report regarding testing of the AR-15. The examination was

---

[2] According to ATF, a registered, lawfully obtained DIAS would cost approximately $40,000. The government contends that Brandon Putman was attempting to cheaply obtain these DIAS duplicates. The original DIAS he brought to the machine shop was itself unregistered and did not contain a serial number. According to ATF, neither Brandon, William, nor Kacie Putman have a DIAS registered in their name or registered to Ephesians 610 LLC.

[3] It is not entirely clear, but this functions check was apparently also done without ammunition. It remains unclear what technically constitutes a "functions check" and how the weapon could have tested as an automatic weapon without firing live ammunition.

conducted in Martinsburg, West Virginia. The report reflects that the AR–15 used an M–16 bolt carrier, and that "the following M–16 machinegun fire control components have been installed: hammer, disconnector, trigger, and selector." *Id.* at pg. 3. The report reflects that, with the selector in the "determined Automatic position," the AR–15 expelled more than one round by a single function of the trigger. *Id.* at pg. 4. Accordingly, ATF determined that the AR–15 was a "machinegun" as defined in 26 U.S.C. 5845(a). The report does not indicate that an auto–sear was used in the test. It is unclear when, if at all, the AR–15 was test fired with the addition of an auto–sear.[4] If such a test was performed, the report of that test was not included in the information furnished by the government.

During the search of the former Putman residence, Agent Jakubowski interviewed William Putman regarding the AR–15 found in his closet, and he explained that it was a gift from Brandon and that Brandon "tinkers" with firearms. Ex. 1 at pg. 35. The statement in Agent Jakubowski's report differs from the statement offered by Agent Ross during his grand jury testimony. *See* Ex. 3 at pg. 46; Ex. 4 at pg. 53. According to the government's latest brief (filed Sept. 4), Agent Ross was not present at the interview. Thus, in his testimony to the grand jury he was apparently offering a second–hand account of the statement. The government indicates that only Agent Jakubowski will testify concerning the statement William Putman made. His account of that statement is memorialized in his report. Ex. 1 at pg. 35.

On the morning of February 15, 2018, at 11:50am, ATF Agents executed a consent search of the Putman Family firearm business in Caro, MI. Ex. 1 at pg. 59. Six silencers were

---

[4] The government explained that the fire-control components installed in the AR-15 (hammer, disconnector, trigger, and selector) rendered it an automatic weapon without the addition of an auto-sear, although those fire control components alone would not be particularly reliable. With the addition of the auto-sear, the AR-15 would be capable of expelling an entire magazine with a single function of the trigger.

seized during the search.[5] *Id.* According to the government's supplemental brief, during the consent search of the business William Putman stated that he was not sure how Brandon would have gotten "the money," considering all expenses had to be approved by the family. Agent Jakubowski understood the statement to be in reference to the $1,000 for the 10 DIAS copies.

On February 28, 2018, an Indictment was returned charging Defendant Brandon Putman with one count of knowingly possessing a firearm not registered to him in the National Firearms Registry and Transfer Record, specifically a drop in auto sear (DIAS), which is a machinegun under 26 U.S.C. §5845(b), in violation of 26 U.S.C. §5861(d). On April 11, 2018, a superseding indictment was returned charging Defendant Brandon Putman with one count of receiving a firearm (DIAS) made in violation of the law, pursuant to 26 U.S.C. §5861(c), one count of knowingly possessing a firearm not registered to him (DIAS) in violation of 26 U.S.C. §5861(d), and one count of knowingly possessing a firearm (DIAS) without a serial number, in violation of 26 U.S.C. §5861(i).

On April 11, 2018, an Indictment was returned charging Defendant William Putman, II, with knowingly possessing a firearm not registered to him, specifically, an AR–15 converted to function in fully automatic mode, which is a machine gun under 26 U.S.C. §5848(b), in violation of 26 U.S.C. §5861(d). On July 10, 2018, Defendants filed a motion for joinder. Defendants also filed a motion for return of property (the silencers) as well as a motion *in limine* to exclude any evidence related to the silencers.

On April 30, 2018, Defendant William Putman was in attendance at Brandon Putman's arraignment. At the arraignment, Defendant William Putman was presented with his indictment, after which he allegedly approached Agents Jakubowski and Ross. During his conversation with

---

[5] An additional search warrant was executed at the new residence on March 6, 2018, though no evidence was seized. Ex. 1 at pg. 65.

the Agents, he allegedly stated that the reason Brandon "was attempting to manufacture multiple Drop–In Auto Sears (DIAS) for AR–15s was to start a family business." Ex. 1 at pg. 61 (Investigation Report – Spontaneous Utterance).

# I.

Pursuant to Federal Rule of Criminal Procedure 13, the Court may order a joint trial of separate cases if all offenses and all defendants could have been joined in a single indictment or information. Federal Rule of Criminal Procedure 8(b) provides that joinder of defendants is permissible if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. Whether to consolidate a criminal trial is a matter within the court's discretion. *United States v. Halper*, 590 F.2d 422 (2d Cir. 1978). A joint trial of multiple defendants is appropriate only if "a sufficient nexus exists between the defendants and the single or multiple acts or transactions charged as offenses." *United States v. Johnson*, 763 F.2d 773, 775 (6th Cir. 1985).

## A.

Here, a sufficient nexus exists between the facts giving rise to the criminal charges in these two cases. In the government's initial response to the motion for joinder, the government contended that the only similarity between the cases was the fact that the AR–15 (for which William is charged) was found during a search warrant obtained as a result of the investigation into Brandon Putman's DIAS. Resp. at 3, ECF No. 14 (Case No. 18–20242). The government further stated that the "drop–in auto sear that is the basis of the charges against Brandon Putman was not used to convert into a machinegun the AR–15 that is the basis of the charge against William Putman." *Id.* More recently, however, the Government has argued as follows:

> The government's evidence will show that *Brandon Putman had modified the AR 15 possessed by William Putman II*, and that the AR 15 had been modified *to*

> *accept an auto sear like the one that Brandon Putman is charged with possessing.*
> The government's evidence in Brandon Putman's case will show that Brandon
> Putman attempted to have his illegal auto sear replicated so he could convert
> semi–automatic firearms, like the AR 15 he gave to his father, into unregistered
> fully automatic weapons, known in common parlance as machineguns

Supp. Br. at 3–4, ECF No. 35 (Case No. 18–20133) (emphasis added). Moreover, Agent Ross offered the following testimony to the grand jury concerning the DIAS Brandon brought to the machine shop:

> Q: Anyway so you went to the machine shop got the auto sear and what did you do with it after that?
> A: What I did is I took the auto sear into our custody and we actually, ATF has a Firearms and Technology Branch . . . and they specialize in determining exactly what this is, so what I did is I sent it off to them.
> Q: And it's your understanding I assume and correct me if I'm wrong that they actually took that part and put it in an AR–15 along with a few other parts and guess what happened found it worked fully automatic?
> A: That is correct.
> . . .
> THE WITNESS: . . . We discovered, it was in his father's room it was an AR–15 that, we mentioned the components, different components, it had all those components in there and it test fired as a fully automatic. We were able, then we got back to the office, we seized it took it back to our office and *we actually put the auto sear back in, it fit perfectly on it. And it had scratch marks we believe, we believe that's where the AR, the auto sear went.*

Ex. 4 at pg. 44, 53 (emphasis added).[6] In sum, according to the government, Brandon modified William's AR–15 to accept an auto sear like the one Brandon Putman is charged with

---

[6] Federal Rule of Criminal Procedure 6(e)(6) provides that "records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal *to the extent and as long as necessary* to prevent the unauthorized disclosure of a matter occurring before a grand jury." (emphasis added). In this case, the Court has already granted Defendant Brandon Putman's unopposed motion for disclosure of grand jury transcripts. For largely the same reasons justifying the disclosure to Defendant, a limited public disclosure of the above-quoted material is justified. Many of the policy considerations for the grand jury secrecy requirement are no longer implicated. An indictment has been issued, so there is no danger of informing an individual that they are being investigated by a grand jury. Grand jury proceedings have also ceased, so there is no danger of interference with deliberations, potential witnesses, or potential evidence. The above-quoted material is necessary for a reader to understand the factual justification for joining the two cases. The public has an interest in access to the information relied upon by the Court in reaching a decision on the joinder motion. The same analysis applies to the portion quoted in the Court's previous order directing supplemental briefing, issued August 29, 2018. Because there does not appear to be any reason to disclose the remainder of the transcripts, however, they will remain sealed but will be attached for the parties' reference.

possessing. ATF tested the AR–15 (apparently with the same auto–sear Brandon is charged with possessing), and it fit perfectly on the AR–15. This not only establishes a strong factual nexus between the two cases, but also appears to contradict the government's initial assertion that "the drop–in auto sear that is the basis of the charges against Brandon Putman was not used to convert into a machinegun the AR–15 that is the basis of the charge against William Putman."

These facts justify joinder, particularly considering the communal living arrangement, William and Brandon's participation in the family business, and the contention that Brandon sought the DIAS copies for a family business. Moreover, the government now states that a joint trial will be "acceptable" if the *Bruton* issue is waived.

**B.**

The government's opposition to joinder has been based in large part on its contention that a *Bruton* issue might arise. In response to the motion for joinder, the government explained that it intends to offer "a statement" made by William Putman regarding the AR–15 to establish an element of his offense. The statement would be considered non–hearsay under Federal Rule of Evidence 801(d)(2) when offered against William. Brandon, on the other hand, would likely have a valid hearsay objection to the statement being admitted against him. In *Bruton*, during a joint trial, the trial court admitted a non-testifying co–defendant's confession which implicated both Defendants. *Bruton v. United States*, 391 U.S. 123 (1968). The trial court instructed the jury that the statement could only be used against the Defendant who made the statement, and that it must be disregarded as to the co–defendant. *Id.* The Supreme Court held that the admission of the co–defendant's statement was prejudicial error, and that a limiting instruction cannot cure the error. *Id.*

After the initial hearing on Defendants' motion for joinder, a great deal of effort was expended to identify the precise statement the government intended to introduce at trial. The government has now specified that the statement at issue is memorialized in Agent Jakubowski's investigation report, and reads as follows:

> Mr. Putman stated that his son Brandon was the person in the family that "tinkers" with firearms and that he would be able to answer all of the gun questions. When asked about an AR–15 rifle that was retrieved from one of the upstairs bedrooms, he stated that he would not know anything specific about an AR–15 but that was a gift from Brandon. Mr. Putman reiterated that Brandon was the person in the family that handled all of the guns.

Ex. 1 at pg. 35. This statement has some tendency to inculpate Brandon as it speaks to his practice of "tinkering" with guns generally, which has some relevance to the crime for which he is accused (though "tinkering" is consistent with lawful behavior as well). Nevertheless, as both parties acknowledge, the *Bruton* issue is waivable. *See United States v. Galeano*, No. 91 CR 223 (JSM), 1993 WL 177853, at *3 (S.D.N.Y. May 17, 1993), aff'd, 50 F.3d 2 (2d Cir. 1995). Based on the discussion during the July 30 hearing, it appears that Defendant Brandon Putman intends to waive his *Bruton* objection to the above statement, while preserving his right to object to its admission on other grounds. Before joinder will be permitted, Brandon will be directed to file a written waiver of any *Bruton* objection to William's statement memorialized in Agent Jakubowski's report. The waiver should explain the nature of the *Bruton* objection and why he chose to waive the objection. A hearing will also be held and Defendant Brandon Putman will be questioned on the record regarding the waiver.

In its supplemental briefing, the government identified two additional statements made by William Putman that may give rise to a *Bruton* problem: "in April of 2018, William Putman, II, volunteered the information that Brandon Putman was trying to have multiple copies of a drop in auto sear made for a family business venture." Pl. Br. at 2, ECF No. 22 (case no. 18-20242). "At

some point, William Putman, II apparently also said something to the effect that he was unsure how Brandon Putman would have the money to pay for the copies of the auto sear because expenditures had to be approved by the family." *Id.* 4, n. 3.

The parties engaged in extensive discussion on the record addressing whether they believe the statements to be inculpatory to the Defendants. However, Counsel for the government ultimately stated on the record that her intention is to offer the statements about the auto-sear against Brandon, not William, because the statements are not relevant to the case against William. Therefore, there is no apparent predicate for the admission of those statements, even if the cases remained separate. Accordingly, there is no reason to ask Brandon to waive an objection to the statements.

## II.

Defendants have also filed two motions concerning the silencers: a motion for return of property, and a motion *in limine*.

### A.

Defendants request the return of "six silencers that had been registered to the business" which ATF agents seized during a consent search of the business on February 15, 2018. Federal Rule of Criminal Procedure 41(g) provides that: "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."

First, there is no reason to believe the search of the business was unlawful. Defendants emphasize that the February 14 search warrant did not authorize a search for, or seizure of, silencers. However, the scope of the search warrant for the former Putman residence has little relevance to the search of the business where the silencers were seized. The search of the business was not conducted pursuant to the warrant; rather it was conducted pursuant to the

consent of William and Kacie Putman. Ex. 1 at pg. 59. Defendants do not argue that the search went beyond the scope of that consent.

As for the seizure, however, it is not apparent that the government had a legitimate reason to seize or retain the silencers. When the government has a "continuing interest" in the property, the property does not have to be returned. *United States v. Popham*, 382 F. Supp. 2d 942, 956 (E.D. Mich. 2005), *aff'd,* 250 F. App'x 170 (6th Cir. 2005). The government can demonstrate a continuing interest by showing that the property is contraband or necessary for an ongoing investigation. *Id.*

According to Agent Jakubowski's report, these silencers were "registered to the business but had not been entered into the bound books until that day." Ex. 1 at pg. 36.[7] During the Sept. 6 hearing, however, it appeared that Agent Jakubowski's report may not be entirely complete. The silencers were registered in the National Firearms Registry to the third–party purchaser, an individual. The silencers were also registered in the National Firearms Registry to the original vendor, an FFL business located out of state. The silencers were to be delivered to the third party purchaser locally in Michigan. However, Federal Law requires that the silencers be transferred by a local FFL transfer agent. Ephesians 610 was acting as that local transfer agent, not selling the silencers directly. Ephesians charges a transfer fee for performing that service. In order to act as the transfer agent, Ephesians must pay a Special Occupation Tax (SOT) and hold a corresponding license (in addition to the FFL). Ephesians' SOT was valid through June 2018 and has not been renewed, though they have applied for a new SOT.

In its response brief, the government emphasizes the requirement that silencers be registered in the National Firearms Registration and Transfer Record. A silencer is considered

---

[7] Two additional silencers could not be accounted for but William Putman and Kacie Putman said they would locate them and contact the ATF agents. *Id.* These silencers have since been surrendered.

contraband if not registered to the person who possesses it. 26 U.S.C. §§ 5845(7) and 5861. Although Ephesians SOT expired in June, it was apparently valid on February 15, 2018, the day the silencers were seized. Furthermore, the silencers were apparently properly registered to both the third party purchaser and the original vendor. Thus, it does not appear that there was any anomaly or non–compliance with respect to the registration requirements.

Rather, the agent took issue with the fact that the silencers "were not entered into the bound books until that day." Ex. 1 at pg. 36. It is unclear when exactly the government contends the silencers should have been "entered into the bound books" and why the failure to do so until February 15 was problematic. Moreover, the government does not appear to contend that the failure to enter them "into the bound books" until February 15 renders them contraband. If this is the government's contention, it is unexplained and unsupported. The government vaguely asserts that "the silencers are potentially evidence of crimes that still may be prosecuted," but does not explain how the failure to enter the silencers "into the bound books" constitutes a crime. Nor does the government explain the relevance of the silencers to any ongoing investigation. Thus, to date, the government has not offered any valid reason for the initial seizure or continued retention of the silencers.

Nevertheless, the present situation does not readily lend itself to a simple resolution. Although it appears that Ephesians could have lawfully acted as the transfer agent prior to June 30, 2018, its SOT has now lapsed. Thus, as a practical matter, it appears that Ephesians cannot legally take possession of the silencers at this point in order to effectuate the transfer of the silencers to the third party purchaser. Nor can the government transfer physical possession of the silencers directly to the third party, as the transfer must be accomplished by a licensed transfer agent.

Accordingly, Defendants now ask the Court to simply direct the government to facilitate the transfer to the rightful owner "in accordance with law." Even assuming such an order would create any obligation on the part of the government that did not already exists, there is a bigger problem with the request. Specifically, Defendants have not established that they are aggrieved parties. Although rule 41(g) does not provide guidance on whether a party is considered "aggrieved," the Sixth Circuit instructs courts to "balance the legitimate needs of the United States against the property rights of the moving party." *United States v. Francis*, 646 F.2d 251, 263 (6th Cir. 1982)). It seems that the only harm Ephesians sustained, if any, as a result of the seizure of the silencers is that it lost its opportunity to perform the transfer service and collect the transfer fee. It can no longer do so, however, because its SOT has lapsed. Thus, Defendants lack standing to seek the return of the property on behalf of the purchaser. Accordingly, the motion for return of property will be denied.[8]

**B.**

Defendants also seek to preclude the government from introducing any evidence regarding silencers. Evidence is admissible if it is relevant and not precluded from admission by another evidentiary rule. Rule 401 provides that evidence is relevant if 1) "it has any tendency to make a fact more or less probable than it would be without the evidence and 2) the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if relevant, Rule 403 provides that a court may exclude it if "its probative value is substantially outweighed" by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

---

[8] If and when the new SOT application is approved, Defendants are free to file another motion for return of property.

First, some clarification is in order regarding the identity of the silencers. A total of 11 silencers are at issue. Six silencers (discussed above) were seized from the business on February 15, and belong to a third party purchaser. These six silencers are in the government's possession, and are the subject of Defendants' motion for return of property. Two additional silencers were also registered to the business. William could not locate them on the day of the search of the business, but they were subsequently provided to the government. Defendants do not seek their return. Three additional silencers were registered to William Putman individually. The government did not seize them, and has apparently never seen them. All the government apparently knows about them is that they are registered in the National Firearms Registry to William Putman and, according to an ATF Agent, they are the right caliber to fit an AR–15. These silencers are apparently being kept under lock and key in the custody of an un-indicted Putman family member. Pursuant to the Court's order setting conditions of pre-trial release, Defendants divested themselves of all firearms, including the three silencers, and pre–trial services apparently approved of them being kept in the family member's custody.

Defendant William Putman contends that the existence of any of the aforementioned silencers has no relevance to whether he knowingly possessed an automatic weapon. The government responds that, with respect to the silencers registered to the business, they have no intention of offering them into evidence in their case–in–chief against William Putman. And, due to the lack of any apparent relevance of those silencers to the elements of his offense, the government will be precluded from doing so. It is unclear as of yet, however, what relevance that evidence might have for impeachment or rebuttal purposes. Accordingly, those alternative uses will not be precluded.

With respect to the three other silencers registered to William Putman individually, the government does intend to offer these into evidence during its case in chief. The government does not contend that his possession of these silencers was criminal or wrongful; to the contrary, the government acknowledges that his possession of these silencers was lawful. Nevertheless, the government contends that, because these silencers could be used to mask the sound of an automatic weapon and help evade detection, his possession of these silencers is relevant evidence for the jury to consider when determining whether he knew his AR–15 could function automatically.

The government explains as follows: ". . . William Putman's residence was located on acreage in a rural area. As a practical matter, as well as a matter of law, William Putman did not need to muffle the sound of a legally configured AR–15 rifle in such a rural setting." Resp. at 4, ECF No. 19 (case no. 18-20242). This explanation is not particularly persuasive. If his property was so remote that he would not need to muffle gunfire from lawful weapons, it would seem that he would not need to muffle gunfire from unlawful weapons either.

Moreover, silencers have a variety of lawful uses which have nothing to do with evading detection, such as protecting one's own ears. Although the silencers have some relevance to William's mens rea, the relevance is minimal absent evidence connecting the silencers to the AR–15 he is charged with possessing. The government has not yet identified such evidence, but indicates that such evidence may be forthcoming in the form of an affidavit of an ATF Agent. Defendants indicated they would like a chance to respond once they receive such an affidavit.[9] Accordingly, the Court will defer ruling on this issue.

---

[9] Defendants are of the opinion that the silencers do not fit the AR-15, and would like to have an expert perform a test to confirm that. They also would like to test fire-the AR-15 to determine if it fires automatically. There was some disagreement between the parties as to whether this test would have to take place in West Virginia, where the AR-15 is being held, or whether it can take place in Flint.

The government will be directed to produce the affidavit to the Court and to opposing counsel within 14 days of the entry of this order.[10] Defendants will be directed to respond within 14 days of the government's filing. Additionally, the government has not responded to Brandon Putman's motion *in limine*, and will be ordered to do so within 14 days.

### III.

Accordingly, it is **ORDERED** that the motion for return of property, ECF No. 15, is **DENIED** without prejudice.

It is further **ORDERED** that the motion for joinder, ECF No 10, and the motion in limine, ECF No. 16, is taken under advisement.

It is further **ORDERED** that the government is **DIRECTED** to file a response to Brandon Putman's motion in limine by **September 25, 2018.**

It is further **ORDERED** that the government is **DIRECTED** to file its affidavit in support of its response to the motions in limine by **September 25, 2018**, and Defendant is **DIRECTED** to file its reply by **October 2, 2018**.

It is further **ORDERED** that, as a condition of joining the cases, Defendant Brandon Putman is **DIRECTED** to file a written waiver of his *Bruton* objection to the statement in question, as set forth above, by **September 25, 2018**.

It is further **ORDERED** that the parties are directed to review sealed exhibits 1 and 2 and inform the Court by **September 25, 2018** of any proposed redactions or if they believe the exhibits should remain sealed. Otherwise, the exhibits will be made public. [11]

---

[10] To the extent the government's intention is to produce this affidavit ex parte for the court's review, it should be accompanied by an explanation as to the justification for submitting it ex parte.

[11] The exhibits already contain some redactions, which in some instances appear to be the identities of unindicted family members. However, the names of other unindicted family members are un-redacted, as well as street addresses and phone numbers, among other things. If Defendants believe these redactions are insufficient, they should submit a copy of the exhibit containing the proposed redactions.

It is further **ORDERED** that the Clerk of the Court shall separately file exhibits 1, 2, 3 & 4 under seal until further order of this Court.

s/Thomas L. Ludington<br>THOMAS L. LUDINGTON<br>United States District Judge

Dated: September 11, 2018

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 11, 2018. The undersigned also certifies that a copy of exhibits 1, 2, 3, & 4 were served upon each attorney of record by U.S. Mail on September 11, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager